THEODORE N. VANGELOFF AND NADESDA VANGELOFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vangeloff v. Commissioner
Docket No. 11890-88
United States Tax Court
T.C. Memo 1992-514; 1992 Tax Ct. Memo LEXIS 526; 64 T.C.M. (CCH) 660; September 3, 1992, Filed As Amended September 3, 1992. *526 Decision will be entered under Rule 155. For Petitioners: Ted Chuparkoff. For Respondent: Robert Kern and John E. Budde. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions To Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6659(a)
1979
$ 9,464
$ 473.20
-0- -0-
$ 2,839.20
1980
10,917
545.85
-0- -0-
3,275.10
1981
8,764
-0- $ 438.20
[4] 2,629.20
1982
13,123
-0- 685.85
[4] 3,106.50
1983
10,644
-0- 532.20
[4] 1,665.60
1984
1,115
-0- 55.75
[4] -0- Additionally, respondent determined that for the taxable years in issue petitioners are liable for increased interest under section 6621(c), formerly section 6621(d). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the *527 Tax Court Rules of Practice and Procedure. The issues we are asked to decide are: (1) Whether petitioners are entitled to Schedule C deductions and investment credits they claimed with respect to Native American Originals, Inc. (NAO), and American Antique Publishing Co. (AAPC) for the taxable years in issue; (2) whether petitioners are liable for the negligence additions to tax determined by respondent for the taxable years in issue; (3) whether petitioners are liable for a valuation overstatement addition to tax for taxable years 1979 through 1983; and (4) whether petitioners are liable for increased interest for the taxable years in issue. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated in this Opinion by reference, irrespective of any restatement below. At the time petitioners filed their petition, they resided in Copley, Ohio. During taxable years 1979 through 1983, petitioner Theodore N. Vangeloff was employed as a general foreman for the Ohio Edison Co., an electric utility company located in northern Ohio. He retired from the company during taxable year 1984. During taxable *528 years 1979 through 1984, petitioner Nadesda Vangeloff was employed as a bookkeeper for the Visiting Nurse Service of Summit County, Ohio, located in Akron, Ohio. Neither petitioner has any formal training nor education regarding art, merchandising, or marketing. Native American Originals, Inc.
Bruce Ferrini, a rare book seller, obtained glass lantern slides (the slides) depicting Southwest American Indians from Professor Olaf Prufer of Kent State University in Kent, Ohio. Professor Prufer had obtained the slides from a dumpster at Kays Institute of Technology, while he was a faculty member. He gave them to Mr. Ferrini without charge. Mr. Ferrini was later associated with a company known as American Antique Graphic Arts, Ltd. (AAGA), through which he attempted to market American antique graphic art. On November 5, 1982, as president of NAO, Joseph Patrelli, a tax consultant and financial planner, entered into an agreement [1] with AAGA to "[contemplate] purchasing various products * * * [each] known as a 'Master' and shall consist of a modern print designed and created * * * from an original work of graphic or photographic art" (the agreement). The masters referred to *529 in the agreement were negatives (the negatives) created from the slides. For each negative, NAO was required to pay a portion of the purchase price in cash with the balance secured by a promissory note. The agreement, however, does not state a purchase price for any negative. During December 1982, petitioners learned about Mr. Petrelli through their daughter. When petitioners met with Mr. Petrelli, he explained to them that if they participated in the NAO promotion they would be leasing negatives from which prints would be reproduced. Mr. Petrelli told them that the prints would sell for approximately $ 40 per print but that expenses would consume approximately 70 to 75 percent of the gross revenue. Petitioners did not lease any slides during the first meeting. Instead, they left to discuss the promotion. On December 20, 1982, after meeting with Mr. Petrelli for a second explanation *530 of the promotion, petitioners signed a lease (the lease). The lease does not provide specific terms regarding the length of the lease, the rent, or the property petitioners would be leasing, but states that such information would be found in Schedule A. Such Schedule A, however, is not a part of the record. The lease does state that the lessor will execute all documents necessary to pass the lessor's investment credit to the lessee and contains an Election to Pass on Investment Credit to Lessee, which Mr. Vangeloff signed, Mrs. Vangeloff witnessed, and Mr. Petrelli signed as president of NAO. Petitioners did not inquire into Mr. Petrelli's background prior to signing a lease. Petitioners did not obtain any appraisals of the slides or the negatives prior to signing the lease. Petitioners accepted Mr. Petrelli's suggestion of which seven negatives to lease without seeing them and did not know of or investigate the photographer prior to signing the lease. The seven negatives petitioners leased were entitled: (1) Oraibi Entrance to Mesh Kiva (Arizona); (2) Snake Dance -- Carrier and Hugger; (3) Isleta Pottery Maker; (4) Acoma Mesa From Distance; (5) Zuni -- Sun Worshiper; (6) Zuni *531 -- 5 Storied Houses; and (7) Typical Adobe House. On December 20, 1982, petitioners paid $ 5,975 to NAO and $ 525 to Rubber City Printing by separate checks drawn on their personal account. Petitioners received a letter dated January 24, 1983, from Mr. Petrelli, which states: For your convenience, Petrelli & Company, Inc. has retained three CPA firms to assist you in prompt tax services. Enclosed is the accounting firm that is handling your 1982 tax returns. Please contact his office once you receive our 1982 W-2 forms. We are working very closely with these accounting firms to provide you with faster service. Petitioners received a letter dated March 8, 1983, from Mr. Petrelli, which states that Aaron's Archives, a distribution company, would display a few examples from petitioners' collection in the lobby of E.J. Thomas Performing Arts. The letter also states that, during April 1983, the executive director of the Indian Centers, Robert Hosick, would present a print to Dr. Guzzetta, President of Akron University, but the letter does not identify the print as being produced from petitioners' negatives. Petitioners received a letter dated March 31, 1983, from Mr. Petrelli, *532 which states that Aaron's Archives had employed the American Indian Cultural Centers as a subdistributor to sell and promote the prints. The letter also states that during April 1983, Mr. Hosick would present "one of several of the reproductions from the Archives" to Dr. James V. Fee, Professor of Mass Media, Roy Ray, Mayor of Akron, John Seiberling, Congressman, and the Morning Exchange, a television program. On May 3, 1983, AAGA and NAO amended the agreement to state that NAO would purchase 78 negatives from AAGA for $ 5 million to be paid by a $ 14,350 cash down payment and a promissory note for the balance due November 5, 1988. Mr. Ferrini thought that Mr. Petrelli's offer of $ 5 million was excessive. Mr. Ferrini neither had the slides appraised nor had the slides insured apart from his overall business insurance. On May 16, 1983, and on July 26, 1983, petitioners paid $ 5,459 and $ 9,493 to NAO, respectively, by checks drawn on their personal account. During August 1983, Mr. Petrelli retained Walter H. Herip Design Associates, Inc., as product designer. Mr. Herip produced copies of prints from at least four negatives. He was not aware of whether any prints were being *533 sold or whether any advertising of the prints had been undertaken. Petitioners received a letter from Mr. Petrelli dated September 16, 1983, which requested that petitioners sign a new lease and a distributorship agreement, both of which were enclosed with the letter. The letter also requested that petitioners date the agreements with the same date used on the lease. Accordingly, petitioners signed the new lease and dated it December 20, 1982. The new lease provides for a 6-year term and requires petitioners to pay rent of $ 8,300 for each of the first 2 months and for the last month of the lease and requires additional rent of 90 percent of the first $ 50,000 of gross receipts and, thereafter, 20 percent of gross receipts for each 12-month period. The new lease defined gross receipts as being net of all advertising, shipping, and distribution costs. The new lease referred to the leased property as "the master photograph and plate set forth on the attached, signed and dated Exhibit One". Such Exhibit One, however, is not a part of the record. Petitioners also signed the distributorship agreement and dated it December 20, 1982. The distributorship agreement grants Aaron's *534 Archives a license to use the negatives for 5 years and provides for a distributor's commission of one-third of gross receipts derived by or payable to the distributor. A Lessor's Election to Pass Investment Tax Credit to Lessee was attached to the distribution agreement. Mr. Petrelli arranged to have Peter Falk and David DeWitt appraise the negatives. Petitioners received such appraisals from Mr. Petrelli. Mr. Falk's appraisal, dated December 7, 1983, determined the fair market value of the negatives as follows: Oraibi, Entrance to Mesh Kiva (Arizona)
$ 70,000
Snake Dance, Carrier & Hugger
75,000
Isleta Pottery Maker
60,000
Acoma Mesa From Distance
20,000
Zuni -- Sun Worshipper
65,000
Zuni -- 5 Storied Houses
75,000
Typical Abode House
35,000
Mr. Falk's appraisal contained no information indicating the basis of such valuation. In a subsequent communication, however, Mr. Falk stated that: The critical key to realizing financial success with this project is via mass-marketing programs similar to Franklin Mint et al, as well as developing other sales avenues. Accordingly, this appraisal assumes that a well-planned and effective marketing strategy will be implemented *535 by Native American Originals. In reaching the values of the negatives, Mr. Falk assumed that the retail price of the prints would range from $ 29.95 to $ 39.95, that estimated total costs would be 60 percent of retail sales, and that only 50 percent of the prints would be sold. Mr. DeWitt's appraisal, dated December 12, 1983, appraised the negatives as follows: Acoma Mesa From Distance
$ 20,000
Oraibi Entrance to Mesh Kiva (Arizona)
75,000
Zuni -- 5 Storied House
75,000
Typical Adobe House
35,000
Zuni -- Sun Worshipper
65,000
Snake Dancer-Carrier and Hugger
75,000
Isleta Pottery Maker
60,000
Mr. DeWitt stated that his figures reflected a net value, after the estimated costs of manufacturing, marketing, advertising, and distribution had been deducted. In an undated letter, Mr. DeWitt additionally opined that the images on the negatives had great historical and aesthetic value for documenting the Zuni and Hopi Indians. In arriving at his fair market-value for the negatives, Mr. DeWitt assumed that the reproductions would have no intrinsic value and that some prints would sell better than others. Mr. DeWitt stated, however, that his valuation presumes strong marketing *536 and advertising efforts on NAO's part. On January 3, 1984, petitioners paid $ 56 to Mr. Falk [2] and $ 42 to Mr. DeWitt by separate checks drawn on their personal account. The record contains minutes of a meeting between "J. Davidson, W. Herip, S. Hecker, and J. Petrelli". The minutes are dated March 29, 1984. The minutes state that mail order, trade shows, and brochures were considered as marketing methods. The record, however, contains no marketing plan. The record contains one purported advertisement of "Native American Originals." Although the name Aaron's Archives appears on the advertisement as the distributor, the record contains no evidence that the advertisement was distributed in any manner. Petitioners never saw the negatives or asked to see them. Petitioners never saw prints from the negatives they leased. Petitioners did not *537 investigate the reputation or experience of the distribution company or Mr. Herip. In that regard, they relied only on the information Mr. Petrelli had given them. Petitioners never independently verified whether any advertising was being undertaken. Petitioners never asked how well the prints were selling or if they were selling at all. Petitioners never received any money from Petrelli. Petitioners relied on Mr. Petrelli regarding their investment in NAO, although they had not known him very long. Petitioners paid NAO approximately 60 percent of the tax refunds obtained as a result of the deductions they claimed with respect to the NAO transaction. American Antique Publishing Co.
During November 1983, petitioner Theodore N. Vangeloff (hereinafter individually referred to as petitioner) became involved with Mr. Petrelli in a second promotion. After one meeting with Mr. Petrelli, petitioner signed a lease, dated November 5, 1983, covering the lease of two negatives depicting antique cigar box labels (the cigar box labels). The term of the lease was 6 years and required petitioner to pay rent of $ 2,057 for each of the first 2 months and the last month of the lease *538 and required additional rent of 75 percent of the first $ 50,000 of gross receipts and, thereafter, 25 percent of gross receipts for each 12-month period. The lease defined gross receipts as being net of all advertising, shipping, and distribution costs. A day or two after petitioner signed the lease, he selected two cigar box labels. The labels were entitled "John Carver -- Long Haired Man" and "Exposition -- Facade of a Building". Petitioner signed a distributorship agreement with Aaron's Archives which provides for a 5-year term and payment of a commission of one-third of gross receipts. Petitioner also signed a form entitled Election to Pass on Investment Credit to Lessee. On June 6, 1984, petitioner paid $ 6,421 to AAPC and $ 704 to Herip & Associates Product Management Co., by checks drawn on the account of Vangeloff & Co. Petitioner received an Appraisal and Valuation of Vintage Classics, Ltd. Master Images. The appraisal was enclosed with a cover letter dated September 6, 1984, from David Lisot, a consultant and appraiser whose services Mr. Petrelli retained. Mr. Lisot stated that his appraisal was based on potential sales. His appraisal, however, reflects certain *539 assumptions, including: (1) A retail value of $ 50 per framed print; (2) a retail value of $ 16 per unframed print; (3) wholesale value at one-half of the above prices; and (4) an aggressive marketing campaign that will include direct mail, trade shows, and sales staff. Mr. Lisot appraised petitioners' two cigar box labels as follows: (1) John Carver -- Long Haired Man, $ 40,000 and (2) Exposition -- Facade of Building, $ 50,000. Petitioner received a letter, dated September 5, 1984, from Vintage Classics, Ltd. The letter included a copy of a brochure which contained antique advertisements. The brochure, however, does not mention either of the cigar box labels. Petitioner received two memoranda from Vintage Classics, Ltd., which summarizes the marketing activity for the months of September through December 1984. The first of such memoranda states that the distributor attended two major trade shows during September: The National Premium/Incentive Show in San Francisco and the Art Buyer's Caravan Show in Atlanta. It also states that advertising was being undertaken in Decor magazine and Potentials in Marketing. The second of such memoranda states that alternative avenues of *540 approach were being investigated, specifically, "stationery, wrapping paper, tins, towels, calendars, postcards, greeting cards, letterhead, puzzles, clothing and gift bags, mugs and ornaments" and that the company was developing specific gift and incentive plans for several Fortune 500 companies. On November 26, 1984, petitioners paid AAPC $ 130 for Mr. Lisot's appraisal of the cigar box labels by check drawn on their personal account. Petitioners did not obtain any independent appraisal of the value of the cigar box labels. Petitioners relied on Mr. Petrelli regarding their investment in AAPC. Petitioners paid AAPC approximately 60 percent of the tax refunds obtained as a result of the deductions petitioners claimed with respect to the AAPC transaction. Petitioners' Income Tax Returns
Dieter Dambrowsky prepared petitioners' income tax return for taxable year 1982. Petitioners timely filed their Federal income tax return for taxable year 1982, in which they claimed a refund of $ 10,919. Petitioners attached a Schedule C to their 1982 return, on which they claimed an $ 8,000 loss for the business activity of "American Native Art". Petitioners attached a Form 3468, Computation *541 of Investment Credit, to their 1982 return, on which they claimed a tentative investment credit of $ 39,500. Petitioners claimed a basis of $ 395,000 in the negatives. Petitioners used $ 10,355 of the investment credit during taxable year 1982. During March 1983, petitioners filed a Form 1045, Application for Tentative Refund, for taxable years 1979, 1980, and 1981. Petitioners carried back their unused investment credit from taxable year 1982 and claimed refunds of $ 9,464 for taxable year 1979, $ 10,917 for taxable year 1980, and $ 8,764 for taxable year 1981. On July 29, 1983, petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, for taxable year 1982 and reported a tax liability of $ 594 pursuant to an alternative minimum tax computation. On March 8, 1984, petitioners signed their income tax return for taxable year 1983. The return was timely filed and was prepared by Joseph Fencl. Petitioners claimed a refund of $ 11,835 on their 1983 return. Petitioners attached a Schedule C to their 1983 return and claimed a business loss in the amount of $ 14,952. Petitioners attached a Form 3468 to their 1983 return and claimed an investment credit of $ 5,600 *542 based on their claim that they had a basis of $ 56,000 in the cigar box labels. Petitioners used $ 5,552 of the investment credit on their 1983 return. On March 25, 1985, petitioners signed their income tax return for taxable year 1984, which claimed a refund of $ 969. Petitioners attached a Schedule C to their 1984 return and claimed a business loss in the amount of $ 7,255. Mr. Dambrowsky prepared petitioners' 1984 return. Petitioners' Suit Against Mr. Joseph Petrelli, et al.
Petitioners filed a complaint against Mr. Petrelli, Petrelli & Company, Inc., NAO, AAPC, Vintage Classics, Ltd., Mr. Liscot, Mr. Falk, and Mr. DeWitt in the Court of Common Pleas of Summit County, Ohio. The case was terminated for unexplained reasons. The complaint states the following: 3. The plaintiffs VANGELOFF were looking for legitimate investments, recognized by the Federal Government and the Internal Revenue Service, entitling the Plaintiffs to income tax credits, deductions and depreciations, in order to minimize or reduce their tax liability to the Government. 4. In 1982, the Defendant PETRELLI introduced to the Plaintiffs an "Investment Plan" whereby the Plaintiffs would be entitled *543 to a tax refund for the year 1982 and the three previous years of 1981, 1980, and 1979. 5. The Investment Plan required the Plaintiffs to lease very valuable master prints of art work and photographic work depicting Indian scenes from the American Southwest during the latter part of the nineteen [sic] century from Native American Originals, Inc. and the American Antique Publishing Co., Inc. 6. In accordance with the Federal laws on income tax and the Internal Revenue Service Code, [sic] the Defendant Corporations would transfer any and all tax credits, as Lessor, to the Plaintiffs as Lessee, treating Lessee as purchaser of the master prints. * * * 15. Investors who participated in PETRELLI's Investment Plan were required to pay him a fee of fifty per-cent (50%) of the investment tax credit, with a portion due immediately upon participation and the balance due upon the receipt of the income tax refund from the Government. 16. The Investment Plan was an illegal scheme designed by Defendant PETRELLI for the purpose of defrauding the Federal Government of unearned income tax refunds. 17. The Plaintiffs did not know the Investment Plan by PETRELLI was an illegal scheme *544 designed by PETRELLI until the Internal Revenue Service demanded a return of the unearned tax refunds for the years 1979, 1980, 1981, 1982, 1983 and 1984 in addition to assigning [sic] penalties and interest against the Plaintiffs. In the complaint, petitioners asked for $ 75,000 compensatory damages, $ 750,000 punitive damages, and attorney's fees and litigation costs. OPINION We must decide whether petitioners' transactions with NAO and AAPC are to be respected for Federal tax purposes and whether petitioners are liable for the additions to tax determined by respondent. We will start by addressing the issues with respect to NAO, after which we will decide the AAPC issues. Finally, we will address the additions to tax. Native American Originals
Respondent contends that the NAO transaction lacks economic substance and that the respective deductions and investment credit petitioners claimed should therefore be disallowed. Petitioners contend that they have proved that they are entitled to such deductions and credit. Petitioners have the burden of proof. Rule 142(a). A "sham in substance" is defined as "the expedient of drawing up papers to characterize transactions *545 contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). Alternatively, a transaction that "is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached," will be respected for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978). A fundamental principle, however, is that "the tax consequences of a transaction are to be governed by its substance, not its form." Schiff v. United States, 942 F.2d 348, 352 (6th Cir. 1991). Whether a transaction lacks economic substance is a question of fact. Ratliff v. Commissioner, 865 F.2d 97, 98 (6th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). The Sixth Circuit, the circuit to which venue for an appeal of this case would lie, has held that the essential inquiry in "determining if a transaction is a sham is whether the transaction has any practicable *546 economic effects other than the creation of income tax losses." Rose v. Commissioner, 868 F.2d 851, 853 (6th Cir. 1989), affg. 88 T.C. 386 (1987). "A taxpayer's subjective business purpose and the transaction's objective economic substance may be relevant to this inquiry." Rose v. Commissioner, supra at 853. Subjective intent to make a profit, however, is insufficient to cause a transaction to be recognized where objective economic substance is lacking. Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985); Martuccio v. Commissioner, T.C. Memo. 1992-311. In deciding whether a transaction is a sham, the relevant consideration is not whether the taxpayer made a "wise investment", but whether the taxpayer made a bona fide investment or merely purchased tax deductions. Bryant v. Commissioner, 928 F.2d 745, 749 (6th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-527. Factors used in deciding whether a transaction has economic substance are: (1) Presence or *547 absence of arm's-length price negotiations; (2) relationship between the sales price and fair market value; (3) structure of the financing of the transaction; and (4) reasonableness of the income and residual value projections. Levy v. Commissioner, 91 T.C. 838, 856 (1988). Consideration of whether a realistic opportunity to obtain a financial return also is helpful to our analysis. Rose v. Commissioner, supra at 854; Martuccio v. Commissioner, supra.
Petitioners contend on brief that although they did not "haggle with Mr. Petrelli over the amount of the lease, or the amount of gross receipts Mr. Petrelli would receive", they did "negotiate" the terms of the transactions prior to signing the lease. Petitioners neglect, however, to specify which terms were negotiated. Moreover, petitioners signed a pre-printed lease without considering any of the terms contained in the lease beyond the anticipated investment credit. The first lease did not specify the length of the lease, the rent, or the identity of the property to be lease, although it did include the "Election to Pass on Investment Credit to Lessee". The new lease which petitioners subsequently signed provides such terms, but petitioners did not sign the new lease until approximately 9 months after they made their investment. We also note that petitioners backdated the new lease at Mr. Petrelli's request.
We also consider the relationship between the rent petitioners paid NAO under the lease and the fair market value of the negatives being leased. The negatives were created from slides that had been retrieved from a dumpster. Allegedly, NAO had purchased the slides for $ 5 million. Under the lease, petitioners paid $ 21,927 to NAO. Additionally, petitioners promised to pay 90 percent of the first $ 50,000 of gross receipts from the sale of the negatives and, thereafter, 20 percent of gross receipts for each 12-month period. At trial, petitioners' expert testified regarding the income potential of the slides. She failed, however, to testify or include in her report any conclusion that petitioners' lease rights possessed any value. Petitioners contend that Mr. Falk's appraisal of the negatives proves their fair market value. We, however, do not attach much significance to Mr. Falk's valuation. Mr. Falk was employed by Mr. Petrelli. He was not qualified as an expert and his appraisal was admitted into evidence solely for the purpose of showing that petitioners received an appraisal regarding the value of the negatives. Mr. Falk's appraisal has little probative value as to the actual value of the lease between petitioners and Mr. Petrelli. Consequently, we hold that petitioners have failed to prove that the fair market value of the negatives was commensurate with the rent they were required to pay for the negatives.
We also consider the structure of the financing for the NAO transaction. The presence of deferred debt, which in substance or in fact is not likely to be paid, indicates that the transaction lacks economic substance. Rose v. Commissioner, 88 T.C. at 419. Petitioners claimed an investment credity based on the $ 5 million purchase price NAO purportedly paid to AAGA. NAO purportedly elected to "pass through" an investment credit to petitioners pursuant to section 48(d). Petitioners, therefore, must prove that NAO had a basis of $ 5 million in the slides. The amended agreement between NAO and AAGA provided that NAO would pay AAGA $ 14,350 in cash and sign a note for the balance of the $ 5 million. Mr. Ferrini, who executed the purchase agreement on behalf of AAGA, testified that AAGA received less than $ 50,000 from Mr. Petrelli. Additionally, the only evidence of the note was the reference to a promissory note in the original November 5, 1982, agreement and the May 3, 1983, amendment between NAO and AAGA and in a letter of representation from Mr. Petrelli to Mr. Fencl. The note itself, however, was not offered at trial. Mr. Ferrini testified that he did not recall signing a note in connection with the November 5, 1982, agreement. Moreover, he did not state that a note was signed in connection with the May 3, 1983, amendment. Mr. Fencl testified that during 1983 Mr. Petrelli showed him a negotiable note representing the balance of the $ 5 million purchase price. Mr. Fencl, however, did not know to whom such note was issued and did not know who prepared the note. Mr. Fencl further testified that he saw check which allegedly had been issued in payment of the note, but he did not know to whom the checks were issued. Mr. Fencl testified that after he saw the $ 5 million note, he requested a letter of representation stating that Mr. Petrelli had paid $ 5 million for the negatives. Although the letter of representation which Mr. Petrelli gave to Mr. Fencl does allege that Mr. Petrelli paid $ 5 million for NAO property and that he owed $ 4.96 million on a note, we hesitate to give much weight to Mr. Fencl's testimony given his inability to recall any specific facts regarding the purported note. Even if we assumed the existence of such note, however, in order to show that the transaction involving the purchase of the slides by NAO had economic substance, petitioners must prove that the note is likely to be paid. Rose v. Commissioner, 88 T.C. at 419-421. The record in the instant case, however, does not convince us that such purported note is likely to be paid. Moreover, we note that the structure of petitioners' transaction as a lease calling for additional rent payments solely from sales is comparable to nonrecourse financing, which calls into question the likelihood that any additional rent would be paid to Mr. Petrelli because he would be left without a flow of funds to pay the note. Soriano v. Commissioner, 90 T.C. 44, 57, 59-60 (1988); Morrissey v. Commissioner, T.C. Memo. 1989-646. Based on the record in the instant case, we hold that petitioners have *548 not proved that the purported purchase price of the negatives upon which they based their claim to an investment credit would be paid. Finally, we consider the reasonableness of the projected income from the negatives, and whether the transaction offers a realistic opportunity for profit, aside from tax benefits. Rose v. Commissioner, 868 F.2d at 854 (quoting 88 T.C. at 405); Levy v. Commissioner, supra at 856. In order to possess such an opportunity, petitioners would have had to recoup more than the rent and expenses of leasing the negatives. Both respondent and petitioners offered expert evidence at trial regarding income projections and realistic opportunity for profit.
During 1991, respondent's expert appraised the seven negatives. Respondent's expert states that the negatives would have an estimated revenue of $ 31,500 based on 9,000 prints of each of the seven images at an average price of 50 cents each. The report estimates expenses of $ 50,000 which leave a potential negative net revenue of $ 18,000. Accordingly, respondent's expert concludes that the fair market value of the rights associated with the negatives is zero.
Respondent's expert states that the negatives are common snapshots by minor photographers and that, although "the subjects are historically and ethnographically interesting, the images are poorly composed and hastily shot even for 19th century work." He adds that the photographer's lack of reputation and the "cheap look" of the prints affect their value. Respondent's expert also concludes:
In any case, the prints are not individually worth more than $ 3.00 each "retail" in an unframed, "as is" format.
* * * * * * * * * *
Considering the commonplace nature of the original images, the actual properties purchased under the terms of the furnished documents, plus many sales precedents and market realities, this appriser can see not other monetary value for the "master" images other than being incorporated in "low-end" reproduction prints. * * *
Respondent s expert also states that he has examined and appraised over 200 similar to the instant case but that the other promotions offered original, hand-signed, and numbered graphics which included a more realistically proportioned quantity of printed properties than the instant case. Petitioners contend that the report of respondent's expert is not credible because it lacks objectivity. In support of their contention, they point to the fact that the report states that "the germane reason for this appraisal is to substantiate reasons for limiting the amount of investment tax credit obtained from the properties" and the fact that respondent's expert testified that the *549 IRS employed him for the purpose of limiting the amount of the investment credit. Even though it is clear that the main purpose of the report is to appraise the prints, we find the statement of respondent's expert troubling and totally inappropriate. Such a statement indicates a lack of objectivity. Frazee v. Commissioner, 98 T.C. 554, 569 (1992) (citing Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990)) ("experts may lose their usefulness and credibility when they merely become advocates for one side."). In the same vein, we also note, as pointed out by petitioners, that respondent's expert stated, in a 1985 appraisal of the entire NAO collection, that the same unframed prints would be worth $ 3. The discrepancy has not been explained. Consequently, we are constrained to limit our reliance on the report of respondent's expert. We turn next to the report of petitioners' expert. Petitioners' expert found the two prints that she examined to be "attractive". The report of petitioners' expert analyzes the potential income of the leased negatives as follows:
If the seven images are all of a similar quality to the two which I have seen * * *, I would evaluate these lantern slides in the following manner: 1,500 prints per year produced from each slide for six years equals 9,000 [sic] total prints of each image. 63,000 prints @ $ 40 each retail less 75% to distributors (the wholesale distributor pays $ 10, sells to the retail outlet for $ 20, which in turns [sic] retails the prictur for $ 40); a net of $ 10 per print less 60% for production and marketing costs including original copy prints and frames leaves a net of $ 4 per print. The total expect net income for the seven negatives would be between $ 126,000 and $ 252,000 or between $ 18,000 and $ 36,000 per negative, based on total sales falling between 50% and 100% [sic].
Seeing that mail order was a planned means of distribution, I would also suggest the following method of valuation: 25% of the prints of each negative (2,250) might be sold through direct mail order. This would produce a slightly higher net value, as not so many middle-men are involved, but additional cost such as advertising and administration must be taken into consideration. If these prints netted $ 10 each ($ 22,500) and another 50% of the prints sold through distributions at a net of $ 4 each ($ 18,000) and 25% remained unsold, the range of values for each negative would be as follows:
$ 36,000 (all prints selling at $ 4 net) up to $ 40,500 for the scenario noted above up to $ 90,000 for all prints selling through direct mail, an unlikely possibility in my estimation.
Therefore, a net of $ 40,000 per image is not unrealistic.
Note: the retail price of $ 40 per image is based on similar framed reproductions, including "limited editions" of 1,500, which sell for an average of $ 30 to $ 50 in outlets such as the Kennedy Studios which are located in Virginia, Florida, Rhode Island and Massachusetts.
We find the foregoing analysis of income potential by petitioners' expert to be flawed for several reasons. Petitioners' expert assumes that potential customers would be interested *550 in purchasing collectibles with a Southwestern theme. She also testified that the active market for Edward Curtis' work "is indicative of the current interest in Native American culture." According to her, Edward Curtis was an American photographer who specialized in Indian culture. In her opinion, Curtis was "the best known of the early photographers of Indian life". She stated that Curtis' photogravures taken from a book published between 1907-30 range in price from $ 75 to $ 150 unframed. She readily admitted on cross-examination, however, that the printing process used in the Curtis photogravures is different than the printing process of the prints in the instant case and that she was not qualified in the technicalities of the differences. Moreover, the report of petitioners' expert does not set forth any information showing how active the market is, the identity of the prospective purchasers in the marketplace, or the reasons for which such purchasers would likely purchase the photogravures. Petitioners' expert also testified that the retail price of the prints would be $ 40 based on her "own research into the market". In her report, she stated that the figure of $ 40 *551 per image is based on similar reproductions which would sell for $ 30 to $ 50, but on cross examination she could not identify where she had seen such reproductions. Additionally, petitioners' expert testified that a marketing plan was important to making NAO profitable. She admitted that, if an appropriate marketing plan had been implemented and the prints did not sell, her appraisal could be wrong. The record does not contain any credible evidence of an appropriate marketing plan. In the face of its admitted importance, we are troubled by her willingness to appraise the prints without any substantial evidence of such a plan. Based on the foregoing, we do not think petitioners' expert has provided sufficient support for her conclusion that petitioners' prints could have sold for $ 40 per print. Consequently, we do not find the report of petitioners' expert to be helpful in deciding whether the transaction offered a realistic opportunity for profit. Petitioners have the burden of proving that their investment in NAO offered a realistic opportunity for profit, but given the inadequacy of their expert's appraisal, we hold that they have not carried such burden. Rose v. Commissioner, 868 F.2d at 854. *552 Accordingly, we hold that the NAO transaction lacked objective economic substance. Rose v. Commissioner, supra at 853; Mahoney v. Commissioner, 808 F.2d at 1220. In addition to our holding that petitioners' transaction lacked objective economic substance, we hold that petitioners did not possess a subjective business purpose for entering into the transaction. Rose v. Commissioner, 868 F.2d 851, 854 (6th Cir. 1989). Petitioners did not have any training or education in the area of art or marketing prior to making their investment. Having paid Mr. Petrelli a fee based on the estimated tax refunds petitioners would obtain from leasing the NAO negatives, petitioners clearly entered into the transaction merely to take advantage of such tax benefits. Petitioners' lack of concern with the terms of the lease is evidenced by the fact that petitioners signed a lease which did not include the most important provisions. Such provisions were not made a part of the lease until after they made their decision to invest in NAO, when the new lease was signed and backdated. Petitioners did not consider any appraisals when they *553 signed the lease. Rather, they accepted Mr. Petrelli's suggestion of which negatives would be leased without ever seeing them. Petitioners never saw prints from the negatives they leased. They failed to spend any appreciable time monitoring their investment. In summary, the record in the instant case evinces petitioners' apparent lack of concern over the prospect of income from their investment independent of the tax benefits which they were promised. Based on the foregoing, we hold petitioners' lease of the negatives from NAO was a transaction which lacked economic substance. Accordingly, we hold petitioners are liable for the deficiencies determined by respondent with respect to NAO. American Antique Publishing Company
As with the NAO transaction described above, petitioners have failed to prove that their leasing of the cigar box labels from AAPC was a transaction which possessed objective economic substance. Rule 142(a). Although petitioners claim that lease provisions were negotiated, they again fail to specify what, if any, provisions of the AAPC lease were negotiated. Petitioners have not offered any evidence regarding the fair market value of the lease rights *554 or any income projections which would support a realistic opportunity for profit. Petitioners argue, but have failed to prove, that Mr. Petrelli paid $ 5 million for his collection of antique advertising negatives. Additionally, for substantially the same reasons we set forth above regarding petitioners' NAO transaction, we find that the record in the instant case fails to establish that petitioners possessed a subjective business purpose regarding the AAPC transaction. Accordingly, we hold that petitioners are liable for the deficiencies determined by respondent with respect to AAPC. Additions to Tax
1. Negligence Addition
Respondent determined additions to tax against petitioners for negligence under section 6653(a) for taxable years 1979 and 1980 and under section 6653(a)(1) and (2) for taxable years 1981, 1982, 1983, and 1984. Under section 6653(a) and section 6653(a)(1), if any part of an underpayment in a year is attributable to negligence, the addition is imposed on the entire underpayment for such year. Commissioner v. Asphalt Products Co., 482 U.S. 117 (1987). Negligence is a lack of due care or a failure to do what a reasonable and *555 ordinarily prudent person would do under the circumstances. Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving respondent's determination incorrect. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners argue that they were not negligent because they relied on the advice of Mr. Petrelli, citing Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), reversing T.C. Memo. 1988-408. In Heasley, the taxpayers monitored their investment, and when they did not receive any income from the two units, they wrote and telephoned the servicing agent to collect their portion of the energy savings. Heasley v. Commissioner, supra at 384. The Fifth Circuit found that the taxpayers acted reasonably in relying on the advice of their financial adviser and were therefore not liable for the negligence addition. Heasley v. Commissioner, supra.Although petitioners in the instant case are unsophisticated, *556 moderate-income investors, they have not shown that they reasonably relied on the advice of Mr. Petrelli. Petitioners invested in NAO and AAPC for the purpose of receiving tax benefits. Their own statements in the complaint they filed against Mr. Petrelli and the other persons and entities involved in NAO and AAPC show that tax benefits were the primary purpose of the investments. We do not believe that a reasonably prudent person would make an investment based on the estimated income tax refund expected for the investment. As we have stated in a similar setting, "no reasonable person would have trusted this scheme to work". McCrary v. Commissioner, 92 T.C. 827, 850 (1989) (citing Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. T.C. Memo. 1981-675). Petitioners relied only on Mr. Petrelli's valuation of the negatives for NAO and AAPC to claim their investment credits, and they did not consider any appraisals prior to claiming their investment credits for the NAO and AAPC property. Petitioners have not shown that Mr. Petrelli had any experience in such matters. Moreover, it is apparent that Mr. Petrelli *557 was not an independent adviser as he was the president of NAO. Under such circumstances, we think a prudent person would have verified the value of the negatives prior to claiming the investment credits. The evidence is insufficient to show that petitioners reasonably relied on Mr. Petrelli's advice. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.    , 111 S. Ct. 2631 (1991); see also Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987). 2. Overvaluation Addition
Respondent determined that petitioners overstated the value of the NAO and AAPC property in the instant case by more than 250 percent and, consequently, that they are liable for 30 percent of the underpayment attributable to the overstatement under section 6659(a). Petitioners have the burden of proving that respondent's determination is incorrect. Rule 142(a). Petitioners argue that because their deductions and credits have been disallowed, no overvaluation addition may be imposed, citing Todd v. Commissioner, 89 T.C. 912 (1987), *558 affd. 862 F.2d 540 (5th Cir. 1988). We think that petitioners have misconstrued Todd. In Todd, we disallowed deductions and credits because the property in question had not been placed in service and therefore no underpayment existed that was attributable to a valuation overstatement. In contrast, in the instant case we disallowed petitioners' claimed deductions and credits because the transactions lacked economic substance. Petitioners also cite Heasley v. Commissioner, supra at 382-382, to support their interpretation of Todd for the proposition that they should not be held liable for the overvaluation addition. Heasley, however, is distinguishable from the instant case as the taxpayers in Heasley conceded their deficiency. See McCrary v. Commissioner, 92 T.C. at 851-855. [3]
*559 When a transaction lacks economic substance, the taxpayer's basis in the asset for the purpose of claiming an investment credit is zero. Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Morrissey v. Commissioner, T.C. Memo. 1989-646. Consequently, petitioners have claimed investment credits of $ 395,000 and $ 56,000 for property in which they have not shown any basis. Accordingly, petitioners have overvalued the property by more than 250 percent and are liable for the 30-percent addition to tax under section 6659(a) for valuation overstatement attributable to the disallowed investment credits. The section 6659 addition, however, does not apply to the lease expenses, printing expenses, appraisal expenses, and advertising expenses deducted in taxable years 1982, 1983, and 1984. Soriano v. Commissioner, 90 T.C. at 60-62. 3. Increased Interest for Tax-Motivated Transaction
Respondent determined that petitioners' underpayments attributable to the NAO and AAPC transactions are subject to interest at the rate determined under section 6621(c), formerly section 6621(d). Section 6621(c) provides for an increased interest *560 rate where an underpayment of taxes in excess of $ 1,000 is attributable to one or more tax-motivated transactions. Section 6621(c) applies with respect to interest accruing after December 31, 1984, even though the transactions were entered into prior to the date of enactment. Cherin v. Commissioner, 89 T.C. 986, 1000 (1987) (citing Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986)). Section 6621(c)(3)(A)(v) specifically includes sham transactions within the scope of a tax-motivated transaction. We have held above that petitioners' transactions with NAO and AAPC lacked economic substance and therefore are economic shams. Consequently, petitioners are liable for increased interest pursuant to section 6621(c). Rose v. Commissioner, 868 F.2d at 854; Soriano v. Commissioner, 90 T.C. 44, 62 (1988); Patin v. Commissioner, 88 T.C. 1086, 1129 (1987), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), *561 affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
4. 50 percent of the interest due on the deficiency.↩
1. The use of terms such as agreement and lease are for convenience only and do not denote conclusions regarding legal relationships.↩
2. Apparently, petitioners dated the check with the wrong year. The check issued to Peter Falk is dated Jan. 3, 1983, but the bank stamp on the back is dated January 1984.↩
3. To the extent that petitioners contend that Heasley v. Commissioner, 902 F.2d 380, 382-383 (5th Cir. 1990), revg. T.C. Memo. 1988-408, could apply to circumstances where the deficiency is not conceded by the taxpayers, we note that we are not bound by such an interpretation as Heasley is a decision of the Fifth Circuit, and the instant case is appealable to the Sixth Circuit. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971).